UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRUSTEES OF THE PAINTERS,
UNION DEPOSIT FUND,

        Plaintiff,

vs.

G&T COMMERCIAL COATINGS,
INC. and ANASTASIOS G. LIANGIS,

        Defendants.
_____/

Civil Action No.
13-CV-13261

Honorable Patrick J. Duggan

## OPINION AND ORDER INTERPRETING THE FRINGE BENEFIT CLAUSE OF THE COLLECTIVE BARGAINING AGREEMENT

### I.  INTRODUCTION

This is an action for unpaid fringe benefit contributions.  Plaintiffs, the Trustees of the Painters Union Deposit Fund, filed this lawsuit on July 30, 2013, alleging that Defendants G&T Commercial Coatings, Inc. (G&T) and Anastasios G. Liangis, its principal, failed to make fringe benefit contributions as required under the terms of the parties' collective bargaining agreement (CBA).  The Trustees seek $159,378.24 in allegedly unpaid contributions on behalf of thirty-two G&T employees for the period beginning January 1, 2012 through May 9, 2013, and liquidated damages in the amount of $31,875.65, for a total of

$191,253.89.[1]  The Trustees also seek costs and attorney fees.  Defendants argue

that they paid all the fringe benefit contributions to which the Trustees are entitled

during the relevant time period.

In its Opinion and Order issued on June 17, 2014, the Court asked the parties

to submit briefs regarding the proper interpretation of the following provision of

the CBA:

### Fringe Benefit Contribution Rate
### For Commercial, Industrial Painters

Employer shall contribute monthly or weekly or at such other
intervals as shall be required by the Trustees to Painters Union
Deposit Fund, in accordance with Article XX hereof, the sum of
[$16.08] for each hour worked during that month or other interval by
all employees employed by him and covered by this Agreement  . . .

The Court hereinafter refers to this provision as "the fringe benefit clause."

As noted in the Court's June 17 Opinion, the parties disagree about the

meaning of the fringe benefit clause.  Defendants argue that the phrase "and

covered by this Agreement" modifies "each hour worked," thus requiring G&T to

contribute only for hours spent performing work that is covered by the CBA.

Conversely, the Trustees argue that the phrase "and covered by this Agreement"

---

[1] Since this lawsuit was filed, Defendants have paid to the Trustees a portion of the
allegedly unpaid benefits sought in this case.  Ruehle Aff. ¶¶ 12-14 (ECF No. 27
Page ID 448).  For this reason, the total amount sought by the Trustees has
decreased from $191,253.89 to $180,628.65.  *Id.*

modifies "employees employed by him," thus requiring G&T to contribute for all work performed by covered employees regardless of the nature of the work.[2]

In light of this disagreement and the insufficient briefing on point, the Court asked the parties to brief the following issues:

(1) Should the fringe benefit clause be interpreted to require contributions only for hours spent performing work that is covered under the CBA, or should it be interpreted to require contributions for all work performed by covered employees?

(2) If the former, what work is "covered"?  If the latter, who is a "covered employee" and is there any dispute whether the thirty-two employees involved in this case are covered?

Regarding the first issue, the Court noted that the rules of construction articulated in *International Union v. Yard-Man, Inc.*, 716 F.2d 1476, 1479-80 (6th Cir. 1983) likely apply and, pursuant to that authority, invited the parties to address the following six considerations:

(1) which interpretation is supported by the language of the fringe benefit clause; (2) the context giving rise to the inclusion of the fringe benefit clause in the CBA; (3) the degree to which the urged interpretation of the fringe benefit clause is consistent with the entire CBA and the relative positions and purposes of the parties; (4) other words or phrases found in the CBA that may shed light on the meaning of the fringe benefit clause; (5) the degree to which the urged

---

[2] As stated in the Court's June 17 Opinion, if Defendants' interpretation is accepted, the Court would need to know the kind of work the employee was doing to determine whether Defendants were under an obligation to contribute for a given hour of work.  If the Trustees' interpretation is accepted, the relevant question in determining whether Defendants were under an obligation to contribute for a given hour of work would be whether the employee performing the work was a covered employee at the time the work was performed.

interpretation is consistent with federal labor policy; and (6) any other indicia of the parties' intent.

The parties have filed briefs discussing these factors and the matter is now ready for decision.

## II.  LEGAL STANDARD GOVERNING INTERPRETATION OF COLLECTIVE BARGAINING AGREEMENTS

In interpreting the fringe benefit clause, the Court applies the following rules of construction:

> Many of the basic principles of contractual interpretation are fully appropriate for discerning the parties' intent in collective bargaining agreements.  For example, the court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent.  The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion.  The court should also interpret each provision in question as part of the integrated whole.  If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties.  As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises.  Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance.  Variations in language used in other durational provisions of the agreement may, for example, provide inferences of intent useful in clarifying a provision whose intended duration is ambiguous.  Finally, the court should review the interpretation ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy.  This is not to say that the collective bargaining agreement should be construed to affirmatively promote any particular policy but rather that the interpretation rendered not denigrate or contradict basic principles of federal labor law.

*Yard-Man*, 716 F.2d at 1479-80 (citations omitted).

## III.  ANALYSIS

### A.  Does "Covered by this Agreement"
### Modify "Hour Worked" or "Employees"?

The Court now addresses the above six considerations under the *Yard-Man* framework to determine whether the phrase "covered by this Agreement" modifies "each hour worked," as urged by Defendants," or "employees employed by him," as urged by the Trustees.

### 1.  *Yard-Man* Consideration (1) – Express Language

The Sixth Circuit has held that "court[s] should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent." *Yard-Man*, 716 F.2d at 1479.  The Trustees argue that their interpretation is more plausible as a matter of grammar and syntax because "it would be highly unusual for the modifying phrase of 'covered by this Agreement' to appear thirteen words after the phrase . . . it is supposed to be modifying."  7/11/14 Supp. Br. at 4-5 (ECF No. 49 Page ID 1275-76).  The Trustees also argue that their interpretation is consistent with: (1) the union's intent "to provide fringe benefits for as many workers as possible . . . and to protect workers so that they receive all fringe benefits to which they are entitled," *id.* at Page ID 1275, and (2) the holding of the only other case that has interpreted materially identical fringe benefit language, *Painters Union Deposit Fund v. D.P.L. Painting, Inc.*, No. 83-CV-0374 (E.D.

5

Mich. Apr. 1, 1985) (unpublished) (attached at Exhibit H to Trustees' Motion for Summary Judgment, *see* ECF No. 27-1 Page ID 482-497).

Defendants contend that the Court has a duty to avoid interpretations that render words or phrases nugatory, and argue that if the Trustees' interpretation is accepted by the Court, the modifying phrase "and covered by this Agreement" would be rendered nugatory. Defendants point out that the term "employee" is expressly defined in the CBA; thus, there is no difference between the CBA's use of "employee" and "employee covered by this Agreement" because all "employees," as defined in the CBA, are necessarily "covered."[3] Defendants also argue that if, in fact, the parties intended to require fringe benefit contributions for all hours worked by covered employees, as the Trustees urge, clearer and more efficient language could have been used to convey that intent.

The Court is persuaded by the grammar and syntax argument made by the Trustees. "Operating on the assumption that most contracts follow most rules of grammar, courts tend to prefer interpretations that conform to those rules." *Payless Shoesource, Inc. v. Travelers Cos., Inc.*, 585 F.3d 1366, 1371 (10th Cir. 2009). Relevant for the present purposes is the grammatical rule that "a qualifying or modifying phrase be construed as referring to its nearest antecedent." *New*

---

[3] "Employee" is defined in Article I of the CBA as follows: "The term 'Employee' shall include all journeymen, foremen, or any employee who acts in the capacity of foreman, supervising the men directly on the job and apprentices as hereinafter set forth." CBA at 1 (ECF No. 25 Page ID 396).

*Castle Cnty. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 174 F.3d 338, 348 (3d Cir. 1999).  *See also* W. Strunk & E. White, The Elements of Style 30 (50th anniversary ed. 2009) ("Modifiers should come, if possible, next to the words they modify.").   Applying this basic rule to the present construction problem, the nearest antecedent to the modifying phrase "and covered by this Agreement" is "employees employed by him."   As the Trustees point out, if the Court were to accept Defendants' interpretation, it would have to conclude that the modifying phrase "and covered by this Agreement" modifies an antecedent phrase placed thirteen words earlier in the sentence, not the antecedent phrase found immediately before the modifying phrase.   Based on the structure of the sentence and the placement of the modifying phrase relative to the phrase "hour worked," Defendants' proposed interpretation is not as plausible as the Trustees' suggested interpretation.

The Court rejects Defendants' argument that the Trustees' interpretation renders the phrase "and covered by this Agreement" unnecessary.  This argument ignores the fact that the drafters of the CBA unambiguously use the phrase "covered by this Agreement" to modify "employee" or "employees" throughout the CBA.  By the Court's count, the exact phrase "employee covered by this Agreement" or "employees covered by this Agreement" is employed no less than seven times throughout the CBA.  *See* CBA at 3, 4, 5, 7, 11 (ECF No. 25 Page ID

398, 399, 400, 402, 406).  Unlike the wording of the fringe benefit clause, where it is not entirely clear what the phrase "and covered by this Agreement" modifies, it is very clear in at least seven other places in the CBA that the drafters used the phrase "and covered by this Agreement" to modify "employee" or "employees." The use of the phrase "employee covered by this Agreement" or "employees covered by this Agreement" throughout the CBA indicates that the drafters either did not view the use of the phrase "and covered by this Agreement" to modify "employee" or "employees" as a superfluous use of words or did view it as a superfluous use of words but opted to use those words anyway.[4]  *See Yard-Man*, 716 at 1480 ("Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance.").

---

[4] The Court notes that, on at least one occasion, the CBA unambiguously refers to "covered" work.  *See* CBA at 7 (ECF No. 25 Page ID 402) ("To protect and preserve for the employees covered by this Agreement, all work they have performed and all work covered by this Agreement and to prevent any device or subterfuge to avoid the protection and preservation of such work, it is agreed as follows: . . .").  While Defendants' urged interpretation is not unprecedented in the CBA, the structure of the sentence at issue here strongly supports the interpretation proposed by the Trustees.

The Court further notes that the drafters of the CBA use language elsewhere in the document that would be considered nugatory under Defendants' logic.  For example, the CBA uses the phrase "employer signatory to this Agreement."  *See, e.g.*, CBA at 11 (ECF No. 25 Page ID 406).  Like the word "employee," the word "employer" is defined in the CBA.  *See id.* at 1 (Page ID 396).  In the same way that it is unnecessary to refer to employees as "covered under this Agreement" given that "employee" is defined in the CBA, it would also be unnecessary under Defendants' logic to refer to "employers signatory to this Agreement" given that "employer" is defined in the CBA.

Moreover, Defendants cite no authority supporting their argument that the efficiency with which a right is conveyed in a contract is relevant to discerning the intent of the parties.   Thus, the Court rejects Defendants' argument that the interpretation urged by the Trustees should not prevail merely because the drafters of the CBA could have conveyed the right more efficiently.

For these reasons, the Court concludes that the language of the fringe benefit clause strongly favors the interpretation urged by the Trustees.   However, the Court acknowledges "that grammatical rules are bent and broken all the time, and [courts] will not enforce the more grammatical interpretation of a contract 'when evident sense and meaning require a different construction.'"   *Payless Shoesource*, 585 F.3d at 1371 (quoting *Link, Inc. v. City of Hays*, 266 Kan. 648, 654, 972 P.2d 753, 758 (Kan. 1999)).   Therefore, the Court does not rely on grammar and syntax alone and examines the remaining *Yard-Man* considerations.

### 2. *Yard-Man* Consideration (2) – Context

The Sixth Circuit has noted that CBA language "can . . . only be understood in light of the context which gave rise to its inclusion."   *Yard-Man*, 716 F.2d at 1479.  Defendants argue, without citation to evidence, that the interpretation urged by the Trustees would cause harm to the intended beneficiaries of the fringe benefit clause.   Defendants contend that an interpretation of the fringe benefit clause requiring contributions for all work, regardless of type of work involved, would:

9

(1) "harm the Union because employers would employ non-Union members to perform non-covered work on worksites, resulting in decreased dues paid [to the union under the CBA]";

(2) "harm the [Michigan Alliance of Union Painting Contractors] because fewer employees would agree to a CBA with such a provision, and [Michigan Alliance of Union Painting Contractors] would therefore receive fewer payments to its industry advancement fund from member-employers under [the CBA]"; and

(3) "harm employees and employers because it would be economically infeasible for an employer to assign 'employees' to perform non-covered work, resulting in a segregated workforce and decreased productivity and flexibility. In turn, 'employees' would be denied the opportunity to perform and be paid to perform non-covered work when non-covered work is the only type of work available."

7/11/14 Supp. Br. 6-7 (ECF No. 50 Page ID 1298-99).

In the section of their brief devoted to context, the Trustees state, without citation to evidence, that the fringe benefit clause was the result of a compromise between employers, who wanted to limit their costs, and the union, who wanted to provide fringe benefits to as many workers as possible. The Trustees state that these "competing interests were reconciled in a negotiated fringe benefit rate, currently $16.08 per hour" – a rate that "provides a contractually agreed-upon compromise allowing the Union to provide fringe benefits to as many workers as possible while limiting the cost for participating employers." 7/11/14 Supp. Br. at 6 (ECF No. 49 Page ID 1277). The Trustees accuse Defendants of now trying to "punch holes in the Agreement's meaning to save money," and argue that the fringe benefit clause would have been worded differently – by using the phrase

10

"covered work" – if the drafters intended to require contributions based on the nature of the work performed, as Defendants urge.  *Id.* at 7 (Page ID 1278).

The Court concludes that the parties' arguments regarding the context giving rise to the fringe benefit clause do not shed light on the meaning of the provision because the arguments asserted by both parties are devoid of evidentiary support.[5] Defendants' argument, which focuses on who the drafters of the CBA intended to benefit and the deleterious effects that would follow if the Court adopted the Trustees' interpretation, is speculative and entirely unsupported by evidence. Likewise, the Trustees' argument about the goals of the contracting parties is devoid of evidentiary support.  For these reasons, the "context" inquiry under the *Yard-Man* framework does not weigh in either party's favor.

### 3. *Yard-Man* Considerations (3) & (4) – Consistency and Other Words/Phrases in the CBA

"[C]ourt[s] should also interpret each [CBA] provision in question as part of the integrated whole" and, "[i]f possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties." *Yard-Man*, 716 F.2d at 1479.  Moreover, "[w]here ambiguities exist, . . . court[s] may look to other words and phrases in the [CBA] for guidance" because

---

[5]  In the Court's June 17, 2014 Opinion requiring the parties to brief this construction issue, the Court invited the parties to "attach supporting evidence to their brief."  6/17/14 Op and Or. at 9 (ECF No. 47 Page ID 1265).  Neither party did so.

"[v]ariations in language used in other durational provisions of the agreement may, for example, provide inferences of intent useful in clarifying a provision whose intended duration is ambiguous." *Id.* at 1480.

The Trustees argue that the reference in the fringe benefit clause to Article XX of the CBA supports their proposed interpretation that contributions are required for covered employees and not covered work.  Article XX – which addresses technical details relating to the Painters Union Deposit Fund and other trust funds, audit rights, and penalties for failure to contribute – does not discuss what type of work would trigger an obligation to contribute, suggesting that the CBA's contribution requirement is not tied to the nature of the work performed. The Trustees also point out that Article XX refers to "each hour worked" as the measure by which the employer shall contribute for fringe benefits, suggesting again that the nature of the work performed is not a relevant consideration in determining whether contributions are necessary.[6]

---

[6] The provision to which the Trustees refer containing the phrase "each hour worked" is similar to the language of the fringe benefit clause:

> In addition to all other payments required by this Agreement, each Employer shall contribute monthly, or weekly, or at such other intervals as shall be required by the Trustees, on forms provided by the Trustees of Painters Union Deposit Fund, that amount of money shown in Article III, Section 3 and Section 5 thereof, as the Total Fringe Benefit Package, for each hour worked during that month or other interval by all employees employed by him and covered by this Agreement . . .

12

Defendants' argument on the "consistency" and "other words/phrases" element of the *Yard-Man* framework is difficult to follow.  They state in their brief:

> The fact that the language of other provisions within the CBA was drafted to apply to all "employees" (as defined in CBA, Art. I, § 3) regardless of whether they perform covered work, demonstrates that the term "and covered by this Agreement," was included in the Clause for a purpose, and that purpose was to modify "hour worked."
>
> An example of such a variation in language can be found in Article XII, Section 1 of the CBA, which states in relevant part: "To protect and preserve for employees covered by this Agreement, all work they have performed and all work covered by this Agreement . . . it is agreed as follows."   In this Section, "employees covered by this Agreement" is necessary to clarify that the provision applies to work performed by "employees," even if that work is not "covered by th[e] Agreement," as well as all work "covered by th[e] Agreement," even if the employee performing the work is not an "employee" "covered by th[e] Agreement" because he or she does not perform the work of a "journeyman, foreman, or . . . apprentice."

7/11/14 Def. Br. at 4 (ECF No. 50 Page ID 1296).  Defendants also refer the Court to sections seven through ten of Article III of the CBA, which address fringe benefit rates for three specific kinds of work.  CBA at 3 (ECF No. 25 Page ID 398).[7]   According to Defendants, "[t]his provides additional evidence that the

---

CBA at 10 (ECF No. 25 Page ID 405).
[7] These sections provide:

**Wallcovering Work**

SECTION 7: Fringe Benefit contributions for wallcovering work shall be as follows: June 1, 2008 – the total or Wages and Benefits requires

Clause intended to require contributions based on the type of work performed rather than the status of [the] employee who performs the work." 7/11/14 Def. Br. at 5 (ECF No. 50 Page ID 1297).

The Court concludes that words and phrases found outside the fringe benefit clause suggest that the requirement to make fringe benefit contributions is not tied to the nature of the work being performed. Although the CBA contains very detailed provisions in Articles III and XX addressing fringe benefit contributions, there is no provision in those articles, or anywhere else in the CBA, even arguably suggesting that the requirement to make fringe benefit contributions depends on the nature of the work being performed. If the requirement to make fringe benefit contributions is, in fact, dependent on to the type of work performed, as

---

one (1) hour of fringe benefit contributions and each year thereafter will increase per Contract.

**Waterblasting and Deep Cleaning**

SECTION 8: The wage rates and provisions for fringe benefit contributions for Insurance, Pension and Vacation are on file at Painters District Council No. 22 and they will be furnished, on request.

SECTION 9: Overtime rates, refer to Article VI.

SECTION 10: When there are six (6) or more men on a job or project, one (1) man shall be designated as a chargeman or foreman and shall be paid Fifty Cents (50¢) per hour in addition to regular wages.

CBA at 3 (ECF No. 25 Page ID 398).

Defendants urge, such a basic aspect of the CBA's fringe benefit framework would undoubtedly be conveyed in a CBA as detailed as the present one, and the CBA would contain language distinguishing between work that triggers an obligation to contribute and work that does not trigger an obligation to contribute.

Defendants argue that the following CBA provision defines "covered" work – work for which fringe benefit contributions are required under a fringe benefit contribution framework that ties the obligation to contribute to the type of work performed: "[A]ny preparatorial work, wall washing, painting, hanging of wallpaper, or wall covering, removal of wallpaper or paper cleaning."   This language is contained in the following CBA provision:

### Article XIII
### Trade Practices

> The Employer agrees that it will not SUBLET OR SUBCONTRACT to any of it's [sic] employees or to any other individual or business entity of any type not signatory to this Agreement by contract or otherwise, any preparatorial work, wall washing, painting, hanging of wallpaper, or wall covering, removal of wallpaper or paper cleaning, unless such person or sub-contractor is party to a signed agreement with the Union.

CBA at 7 (ECF No. 25 Page ID 402).  According to Defendants:

> It is unsurprising that we find the most succinct statement of what is 'covered work' in the subcontracting clause because through that clause the Union is attempting to assure that an employer will not avoid the CBAs' wage and benefit obligations by simply assigning the work to another person or entity.  The Union is not interested in whether the employer subcontracts any other kinds of work because other kinds of work are simply not "covered by th[e] Agreement."

15

7/11/14 Def. Br. at 14 (ECF No. 50 Page ID 1306).  While Defendants may be correct that this provision was meant to describe work that is "covered" under the CBA, Defendants fail to point to any CBA language suggesting that fringe benefit contributions are required only for the type of work described.

The absence of any provision of the CBA describing a framework in which the requirement to make fringe benefit contributions is tied to the nature of the work being performed suggests that such a framework was not intended.  By the same token, the presence of a reasonably discernable framework in the CBA suggesting a system whereby fringe benefit contributions are required for all work performed by covered employees leads the Court to believe such a framework was intended.  The Court believes the framework is reasonably discernable because, as discussed, grammar and syntax support the conclusion that contributions are required for work performed by covered employees, and the word "employee" is explicitly defined in the CBA.

### 4. *Yard-Man* Consideration (5) – Federal Labor Law

The Sixth Circuit has stated that a court's interpretation of a CBA should be consistent with federal labor policy in that it should "not denigrate or contradict basic principles of federal labor law."  *Yard-Man*, 716 F.2d at 1480.  Defendants argue that the Trustees' urged interpretation denigrates federal labor policy because it ties the right to fringe benefit contributions to union membership:

> An interpretation of the Clause that determines compensation based on the type of work performed furthers federal labor policy; an interpretation of the Clause that determines compensation based on union status or past performance denigrates federal labor policy.
>
> It is the official "policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce . . . by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association." 29 U.S.C. § 151(d). The interpretation urged by Defendants furthers this policy by "protecting the exercise by workers of full freedom of association." It does so by allowing employees to choose whether or not they wish to become union members, and by compensating employees based on the work they perform, and it protects fringe benefit funds by securing contributions for covered work.

7/11/14 Def. Br. at 10 (ECF No. 50 Page 1302).

Defendants' argument is unpersuasive. One flaw in Defendants' argument lies in the belief that their proposed interpretation of the fringe benefit clause "allow[s] employees to choose whether or not they wish to become union members." Defendants do not explain why they believe this to be so. Notably, the CBA contains a so-called "union-shop" clause:

> The employer agrees that for the duration of this Agreement, he will require all employees hired by him to be members in good standing, or to become members in good standing of the International Union of Painters and Allied Trades (AFL-CIO) after the seventh (7th) day following the beginning of their employment or the effective date of this Agreement, whichever is later, and to remain members in good standing thereafter, for the duration of their employment.

CBA at 1 (ECF No. 25 Page ID 396). Union-shop clauses like the one here are permissible, except that employees must be allowed at least thirty days from the

17

beginning of their employment (and not seven, as the CBA here provides) to join the union:

> Sections 8(a)(3) and 8(b)(2) authorize collective bargaining parties to enter into agreements by which employees working under such agreements may be required, as a condition of employment, to obtain and maintain "membership" in a union. The Act itself limits that authority, however, in several important respects. First, employees subject to union-shop clauses must be allowed at least 30 days to join the union. Furthermore, only when loss of union membership results from the member's failure to pay union dues or initiation fees may the union-shop clause be invoked to cause the employee's discharge, and only if the requirement is enforced on a uniform, nondiscriminatory basis. Finally, the union's authority to enter into a union-shop agreement may be discontinued by majority vote of the affected employees in an election held pursuant to Section 9(e) of the Act.

2 Patrick Hardin & John E. Higgins, Jr., The Developing Labor Law 1968 (4th ed. 2001) (footnote omitted). Therefore, under this CBA, no one can choose whether to become a union member, so it cannot be the case that the interpretation of the fringe benefit clause urged by Defendants gives an employee that choice.

Another problem with Defendants' argument is the assumption that the Trustees' proposed interpretation "determines compensation based on union status or past performance." Under the Trustees' proposed interpretation, fringe benefit contributions must be made for all hours worked by "employees covered by this Agreement." As noted above, the word "employee" is defined in the CBA as follows: "The term 'Employee' shall include all journeymen, foremen, or any employee who acts in the capacity of foreman, supervising the men directly on the

18

job and apprentices as hereinafter set forth." CBA at 1 (ECF No. 25 Page ID 396). This definition, which uses the word "include" in an illustrative sense and is therefore not necessarily an exhaustive list of who may be deemed an "employee" under the CBA, *see Trustees of Laborers Pension Trust Fund v. Metallizers of Mid-America, Inc.*, No. 13-CV-14874, 2014 WL 4059864, at *4 (E.D. Mich. Aug. 14, 2014) (unpublished) (discussing the meaning of the contractual term "including"), does not itself require union membership; rather, it is the union-shop clause that requires union membership. It is possible that, under the Trustees' interpretation of the fringe benefit clause, fringe benefit contributions may be required for hours worked by employees in the first thirty days of their employment, before they are required to join the union. In sum, Defendants' assumption that the Trustees' interpretation would provide fringe benefits only to union members is unexplained and flawed.

For these reasons, Defendants have not convincingly argued that accepting the Trustees' proposed interpretation of the fringe benefit clause would "denigrate or contradict basic principles of federal labor law." *Yard-Man*, 716 F.2d at 1480.

### 5. *Yard-Man* Consideration (6) – Other Indicia of Intent

Under the *Yard-Man* framework, courts may look to other indicia of intent, such as "the bargaining history, the context in which the contract was negotiated, the interpretation of the contract by the parties, and the conduct of the parties

19

bearing upon its meaning." *Int'l Bhd. of Elec. Workers v. Nat'l Labor Relations Bd.*, 788 F.2d 1412, 1414 (9th Cir. 1986). Defendants argue that the conduct of the Trustees, counsel for the Trustees, the auditor of the Trustees, and Defendants' employees reflect their understanding that contributions are required for covered work. Specifically, Defendants point out:

- The following two statements made by counsel for the Trustees in briefs submitted in connection with this matter indicate that counsel is under the impression that fringe benefit contributions are required only for covered work: (1) "Under the governing [CBA], Defendant G&T is obligated to make fringe benefit payments at the designated hourly rate for each hour of covered work performed," Pl. Resp. Br. at 1-2 (ECF No. 37 Page ID 812-813); (2) "The collective bargaining agreement at issue requires payments according to each hour paid each employee performing covered work . . ." Pl. Mot. for Summ. J. at 6 (ECF No. 24 Page ID 382).

- The following statement made by the Trustees' auditor, Jeffrey Ruehle, indicates that Mr. Ruehle is under the impression that the nature of the work performed determines whether fringe benefit contributions must be made: "I amended the debit memo downward because I was satisfied to the extent of the amount of the reduction given . . . that payments made to the employees through the general register were not for covered work." Ruehle Aff. ¶ 13 (ECF No. 27 Page ID 448).

- One of Defendants' employees is under the impression that fringe benefit contributions must be made on his behalf only for covered work performed. Israel Barajas, an employee of Defendants, testified that he would sometimes receive two paychecks covering the same time period, one compensating him for his painting work, in which fringe benefit contributions would be made, and another compensating him for non-painting work, in which contributions would not be made. Barajas Dep. at 11-12 (ECF No. 22-8 Page ID 242-243).

Based on this, Defendants argue that the conduct of the Trustees during the course of this litigation indicates their agreement with Defendants' proposed interpretation of the fringe benefit clause.

The Trustees do not offer an explanation for the statements made by their counsel and auditor, which clearly evince their understanding that fringe benefit contributions are required for covered work.   With regard to Mr. Barajas' deposition testimony, the Trustees argue that "contributions are due to [him] even if he does not understand he is eligible for fringe benefits that were not paid on his behalf." 7/28/14 Supp. Resp. Br. at 4 (ECF No. 52 Page ID 1326).

The Court agrees with Defendants that the Trustees' attorney and auditor have made statements during the course of this litigation that undercut the interpretation for which the Trustees are advocating.  This *Yard-Man* consideration weighs in favor of construing the fringe benefit clause in accordance with Defendants' position.

Having conducted the required analysis, the Court concludes that the interpretation proposed by the Trustees should prevail.  Although one of the *Yard-Man* factors favors the interpretation proposed by Defendants, that one factor is not enough to overcome the other factors weighing in the Trustees' favor.   In particular, the Court places a heavy emphasis on the express language of the fringe benefit clause.  Based on the phrasing of the clause at issue, the Court concludes

that the parties intended to require the payment of fringe benefit contributions for work performed by "employees," as that word is defined in the CBA, and not based on the nature of the work performed.

The Court's construction of the fringe benefit clause is consistent with the only other case to have interpreted a materially identical clause – *D.P.L. Painting* – a case involving the same Plaintiff as in the present case.  There, U.S. District Judge Philip Pratt interpreted the following CBA language:

> [E]ach Employer shall contribute monthly or weekly or at such other intervals as shall be required by the Trustees, to the Painters Union Deposit Fund, in accordance with Article XVIII hereof, the sum of [$4.00] for each hour worked during that month or other interval by all employees employed by him and covered by this agreement . . .

*D.P.L. Painting*, slip op. at *2.  The dispute in *D.P.L. Painting* was the same as here – whether "and covered by this agreement" modifies "each hour worked," as urged by the employer, or "employees employed by him," as urged by the Trustees:

> Plaintiff urges that the agreement be interpreted so that if any covered employee performed work – covered or uncovered – fringe benefit contributions for each hour worked would be required.  As noted, the defendant argues that plaintiff's position is only the first step in this court's inquiry; and that the court must next ask if the work performed was covered work, and only then would it be liable for the work performed by its employees.

*Id.* at *5.  In reaching its ultimate conclusion in favor of the construction urged by the Trustees (i.e., "and covered by this agreement" modifies "employees employed

22

by him"), the court did not engage in the analysis required by the Sixth Circuit in *Yard-Man* even though *Yard-Man* predated *D.P.L. Painting*.  Instead, *D.P.L. Painting* relied on a number of other cases interpreting remotely similar – but by no means materially similar – CBA language.  *See Waggoner v. C & D Pipeline Co.*, 601 F.2d 456 (9th Cir. 1979) (interpreting CBA language requiring fringe benefit contributions for "hours worked by (or paid) each employee under this Agreement"); *Kemmis v. McGoldrick*, 706 F.2d 993 (9th Cir. 1983) (same); *Burke v. Lenihan*, 606 F.2d 840 (9th Cir. 1979) (same); *Teamster's Local 348 Health & Welfare Fund v. Kohn Beverage Co.*, 749 F.2d 315 (6th Cir. 1984) (failure of CBA to distinguish between union members and non-union members led to conclusion that CBA covered both).

Because *D.P.L. Painting* did not engage in the required analysis pursuant to *Yard-Man*, the Court does not find the case particularly instructive.  The Court does, however, agree with *D.P.L. Painting*'s observation that the CBA's "silence on covered and uncovered work suggests, at least by inference, that the agreement covers all work performed by covered employees." *Id.* at *8.  This is a permissible consideration under the *Yard-Man* framework and an observation that the Court has made in its analysis above.[8]

---

[8] Because this Court's decision is not heavily influenced by *D.P.L. Painting*, it is not necessary to address Defendants' argument attacking the reasoning of that case.

### B.  Who is an "Employee" who is "Covered by this Agreement"?

In light of the Court's interpretation of the fringe benefit clause to require fringe benefit contributions for all work performed by covered employees, the final issue that must be addressed is who qualifies as an "employee" who is "covered by this Agreement."  The answer is found in the CBA.  As discussed, the CBA defines "employee" as follows: "The term 'Employee' shall include all journeymen, foremen, or any employee who acts in the capacity of foreman, supervising the men directly on the job and apprentices as hereinafter set forth."  CBA at 1 (ECF No. 25 Page ID 396).  Pursuant to this definition, the Court concludes that "employee covered by this Agreement" includes, at a minimum, the categories of workers described.  *See Metallizers of Mid-America*, 2014 WL 4059864, at **4-5 (discussing the meaning of the participle "including," noting that it typically "indicates a partial list") (quoting Black's Law Dictionary (9th ed. 2009). However, the class of workers for whom fringe benefit contributions must be made pursuant to the fringe benefit clause is limited by the title of the clause, which clarifies that fringe benefit contributions under that particular provision of the CBA are only required for "Commercial, Industrial Painters."  The words "commercial" and "industrial" are undefined in the CBA.[9]

---

[9] The Court notes that the CBA contains a definition for the word "residential." *See* CBA at 1 (ECF No. 25 Page ID 396).

## IV.  CONCLUSION

For the reasons discussed above, the Court construes the fringe benefit clause, found at Article III, section three of the CBA, to require fringe benefit contributions for all hours worked by "employees" who are "covered by this Agreement."  Covered employees "shall include all journeymen, foremen, or any employee who acts in the capacity of foreman, supervising the men directly on the job and apprentices as hereinafter set forth," subject to the limitation that contributions are only required under the fringe benefit clause for employees who are "commercial, industrial painters."

The Court will issue a notice setting a status conference for the purpose of discussing how the parties wish to proceed.  The parties shall confer prior to the status conference and attempt to agree on a mutually agreeable course of action.

**SO ORDERED**.


Dated: September 17, 2014                    s/PATRICK J. DUGGAN
                                             UNITED STATES DISTRICT JUDGE

Copies to:

Stephen D. Kursman, Esq.
Daniel G. Helton, Esq.
Robert E. Day, Esq.